NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

HARRY WARTELL, PETITIONER, v. JOHN J. McGARRITY, RESPONDENT.

Decided September 21, 1942.

For the petitioner, *Boyle & Archer* (*Frederick P. Greiner*).

For the respondent, *Ralph N. Kellam*.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

It is alleged in the claim petition that Catherine Wartell, wife of the petitioner, was in the employ of the respondent on April 13th, 1941, at the Log Cabin Lodge, Medford, New Jersey, as head waitress, that on that day, while walking through the dining room in the course of her duties, the said Catherine Wartell slipped and fell on the floor, injuring her hip, and that as a result thereof she died on June 22d. 1941. It is further alleged that the petitioner, husband of the said Catherine Wartell, was dependent upon the said Catherine Wartell at the time of the accident or death. The petition also sets forth that petitioner, by reason of defective vision, has been unable to pursue his occupation of men's tailoring for the past seventeen years, and that up to the time of the

aforementioned accident he was wholly supported during that period by the decedent.

The answer of the respondent denies that the petitioner was dependent upon the deceased at the time of the accident or death.

It was agreed that the decedent, Catherine Wartell, was in the employ of the respondent on April 13th, 1941; that on that day she sustained an accident arising out of and in the course of her employment with the respondent; that as a result of the accident the said Catherine Wartell died on June 22d, 1941; that the respondent had due knowledge of the occurrence of the injury; that decedent worked four days a week, was paid $4.50 per day, but in view of the provisions of the Workmen's Compensation Act, the compensation rate must be based on wages of $4.50 a day, a minimum five-day week, or $22.50 per week.

It was further agreed that the medical expenses incident to the treatment of the said Catherine Wartell, because of the accident, were paid by the insurance carrier of the respondent, and, in addition, respondent's insurance carrier paid temporary disability for a period of nine weeks, at the rate of $10 per week; and that the funeral expenses amounting to $283 were paid by the petitioner.

The petitioner, Harry Wartell, according to his testimony, was married to the decedent, Catherine Wartell, on April 6th, 1931, in Windsor, Canada; he continued to live with the decedent until her death; at the time of the death they were residing at 7113 Louise Road, Philadelphia, West Oak Lane, to which place they moved in the year 1926; prior to their residence in Philadelphia, they resided at Canton, Ohio. During their residence in Canton, Ohio, petitioner's occupation of tailoring included selling, altering men's clothes. Petitioner stated that the work required him to distinguish different shades of material, different weaves and designs, that it was necessary to use a needle, tape measure, and piece of chalk, that because of the condition of his eyes, he "couldn't see things right," that he got confused on the patterns, that it was diffcult for him to distinguish colors, and that he was unable to thread a needle. It also appears from his testimony

that in the year 1926 his employer went into bankruptcy, that thereafter petitioner and his wife moved to Philadelphia, and from that time on he did no more work. The decedent was continuously employed thereafter. She had two employers, N. Snellenberg & Co. and the respondent, John J. McGarrity, who conducted a restaurant and hotel at Medford Lakes, New Jersey. Petitioner stated that his wife's weekly earnings ran from $35 to $60, that during the entire time they resided in Philadelphia the decedent supported the petitioner. She furnished board, room, clothing, spending money, medical attention, and, in fact, everything that was needed by the petitioner. The petitioner stated that the cost of his maintenance approximated $21 a week, that these expenses were paid by the decedent out of her earnings; that they had one daughter, Grace Wartell, who is now 28 years of age. Petitioner stated that because of his eyes, he cannot read a newspaper, he does not read books. Petitioner also stated that the condition of his eyes has gotten gradually worse through the years, from the year 1926 to the year 1942.

Petitioner is 58 years of age, and the decedent, at the time of her death, was 52 years of age.

The petitioner further testified that while he and the decedent lived in Philadelphia, he performed the necessary household duties that had to be performed in the home.

Miss Grace Wartell, daughter of the petitioner and the decedent, testified that she has always resided with her mother and father; that she recalled the occasion when the family moved to the City of Philadelphia, approximately in the year 1926; that, to her knowledge, her father has not been gainfully employed since they moved to Philadelphia, and that her mother was gainfully employed during that time, that she was employed at N. Snellenberg & Co. and the Log Cabin Lodge, Medford Lakes. She further stated that her mother averaged from $35 to $60 a week, depending on tips. This witness further stated that she is presently self-supporting, and has been for some time, to wit, since the year 1934. Before that time her mother paid all the living expenses and other expenses for the members of the family. After this witness started her employment she paid the sum of $8 a

week board to her mother. She stated she never contributed to the support of her father, and that while her mother was out working her father took care of the home, and that, to her knowledge, her mother completely supported her father.

Grace Wartell further testified that her father worked while they lived in Canton, Ohio, that he was not employed after they moved to Philadelphia, and that her father did the work around the house after they moved to Philadelphia.

The respondent produced Dr. James S. Shipman, who testified that he examined the petitioner on March 20th, 1942. The doctor stated that the petitioner's vision was taken with the glasses he was wearing, that his vision in the right eye, with correction, was six over twenty-one, or approximately 75% of normal; vision with the glasses he was wearing, in the left eye, was six over twelve, or approximately 90% of normal. The doctor stated: "We attempted to refract him, roughly, to improve his vision, and with a change in his glass his vision in the right eye was improved to six over fifteen, or 80% of normal and his vision in the left eye was improved to six over six minus one letter, or practically normal in his left eye." The doctor further stated: "In view of the patient's symptoms, complaints, which were that he had some trouble getting around in the dark, among other things, we felt that it was wise to take a visual field test on him to see what his peripheral vision was and this test showed that his peripheral vision in his left eye was entirely normal, although there was a slight temporal contraction of the visual field in the right eye." The left eye was entirely normal, with the exception that he said he had a little difficulty picking up colors, blue and green at the center. There was a slight suggestion of a central scotoma for colors. The doctor stated that petitioner had trouble in relation to colors, distinguishing a dark blue from black. Further findings made by Dr. Shipman were as follows:

"The eyes were examined externally and there was a suggestion of some ptosis or slight drooping of the right upper lid which the patient could overcome voluntarily. It was not a true paralysis of the levator muscle as is the case in a true ptosis; otherwise, the eyes were externally entirely nor-

mal; conjunctiva were healthy; cornea were clear; pupils were round, equal, regular, and reacted well to light. There was no evidence of any extra-ocular paralysis, paralysis of the extra-ocular muscles.

"Looking into the eye with the ophthalmoscope, the right eye showed a few fine vitreous opacities and in the eye-grounds there was noted a considerable amount of salt and pepper-like pigmentary disturbances in the periphery with many small and some large choroidal deposits, which are not unusual and have no particular pathological significance. These were scattered mainly in the macula region.

"There was an old area of what apparently was a pathological condition down and in from the optic disc, suggesting an old chorioretinitis, but the optic nerve itself was entirely normal in color and outline, with no evidence of cupping or choking.

"The left eye showed the media to be clear except for a very few fine vitreous opacities. The eye-grounds showed a similar pigmentary disturbance in the periphery but with no evidence of any pathological scars or lesions as was noted in the inferior nasal portion of the right eye. The optic nerve was entirely normal in color and outline, with no cupping or choking and there were no fresh hemorrhages or exudates seen in either eye. And as stated before, with manifestra refraction; that is, without any drops, but refracting the patient and relying on his own statement his vision in the right eye was improved to 80% of normal for central vision and in the left eye to 99% of normal, 99½% of normal."

In referring to the conditions found in petitioner's eyes that would affect his ability to see, the doctor stated:

"The one in the right eye when it was active, and when that was I can't state; it may have been five years ago; it may have been twenty-five years ago; undoubtedly did affect his vision at that time and it unquestionably still does affect the vision of the right eye to some extent. As stated, the best we could improve that vision was to 80% of normal, and I think that old scar has something to do with it and also the astigmatism which he has which is due to the curve of the cornea. He takes a very much stronger glass in that

eye than he does in the other; he takes a very weak glass in his left eye, and it's quite possible that this eye has been that way since birth; that the vision in his right eye has always been poorer than it is in his left, and I firmly believe that that is quite probable. But you asked me if the lesion could affect his vision. It could have and probably did when it was active, but I don't believe that—that the only effect that that would have now is to give him a small blanked out spot in that area of his field of vision that it would correspond to, but it wouldn't affect his central vision which is impaired, and for that reason I feel that his central vision in that eye has probably been impaired some since birth."

Considering all the testimony, I find that the petitioner, Harry Wartell, was the husband of the decedent, Catherine Wartell; that until the year 1926 the said Harry Wartell was steadily employed in the men's tailoring business in the State of Ohio, and from his earnings in that trade, regularly and continuously supported the said Catherine Wartell and their minor daughter, Grace Wartell; that in the year 1926 bankruptcy of his employer threw petitioner out of work, and he and his family moved to Philadelphia, Pennsylvania; that tailoring, the only trade petitioner knew, required close work under artificial light upon varying shades and designs of materials, and petitioner, by reason of an eye condition, began to encounter difficulty in distinguishing the material colors and designs, and even in threading a needle. Consequently, petitioner and his wife arranged that she should accept gainful employment and he take charge of the home and care for the minor daughter. Having thus reversed the customary arrangement for maintenance of the family, husband and wife found their plan mutually satisfactory and continued it without interruption for some sixteen years, until the death of the wife.

In dispute of these facts respondent's only ground for rejecting petitioner's claim is his contention that his eye condition prevented his gainful employment.

Dr. Shipman, who testified on behalf of the respondent, was unable to say with certainty what petitioner's eye condition was sixteen years ago, five years ago, or even on April

13th, 1941, when the accident to Catherine Wartell occurred, or on June 22d, 1941, when Catherine Wartell died as a result of the accident. Dr. Shipman found evidence of a former inflammatory condition, the date of which he could not fix, which in its acute stage would have affected petitioner's vision to an extent seriously hampering him in his tailoring work. It is by no means clear that 75% vision in one eye and 90% vision in the other, the percentages determined by Dr. Shipman, are adequate for proper execution by petitioner of the fine, close work of petitioner's trade. Petitioner, a tailor, says they are not and respondent offers no proof of any tailor carrying on his work with vision equally defective. Dr. Shipman believes he can increase petitioner's vision to 80% in the right eye and 99% in the left, but certainly petitioner in determining, as a practical matter, whether his eyesight was adequate for his trade, is not bound by the opinion of respondent's physician, whom, before March 20th, 1942, he had never seen. In any event, the only evidence regarding the condition of petitioner's eyes, from the year 1926 to the date of Dr. Shipman's examination, is the testimony of the petitioner, who says his vision was inadequate for carrying on the trade he knows.

Regardless, however, of petitioner's physical condition in the year 1926, or at any time since, petitioner at the time of the accident and death of Catherine Wartell and for sixteen years prior thereto, was wholly supported by her. Dependency in fact, is proof beyond question. A husband is included by the Workmen's Compensation statute among those entitled to those benefits (*R. S.* 1937, 34:15-13g; *N. J. S. A.* 34:15-13g), and it necessarily follows that compensation in accordance with the statute is payable to the petitioner. Actual dependency within the meaning of the statute is dependence in fact, and whether it exists is a question of fact. *Miller* v. *Public Service Railway Co.,* 84 *N. J. L.* 174; 85 *Atl. Rep.* 1030.

Harry Wartell is related to the decedent, Catherine Wartell, in a degree mentioned in the act, and at the time of her accident and death and for many years prior thereto, was wholly supported by her. He fully qualifies for compensation

under the provisions of our act. Certainly, where, as here, there is dependency in fact, the Workmen's Compensation Bureau is neither required nor authorized by the Workmen's Compensation Act to pass judgment on the deceased employee's reasons for supporting such dependent. Its province is to determine "whether"—not "why"—dependency exists.

The Workmen's Compensation Act makes no distinction between a husband and other dependents and contains no prohibition against a family arrangement under which a husband and wife each regularly perform duties normally performed by the other. The statute is broadly drawn and is to be liberally construed. *Bower* v. *Metal Compounds Corp.,* 121 *N. J. L.* 421; 3 *Atl. Rep.* (*2d*) 164; *affirmed,* 122 *N. J. L.* 380; 5 *Atl. Rep.* (*2d*) 699. Its purpose is surely defeated if its benefits are denied to a man who devotes his efforts to domestic work necessary to the family maintenance simply because that work is normally performed by a woman.

I further find that Catherine Wartell, on April 13th, 1941, was in the employ of the respondent as a head waitress; that on that day she sustained an accident arising out of and in the course of her employment with the respondent, resulting in her death on June 22d, 1941; that the respondent had due actual knowledge of the occurrence of the injury.

\*        \*        \*        \*        \*        \*        \*

It is, therefore,   \*   \*   \*   ordered that judgment be entered in favor of the petitioner and against the respondent.

\*        \*        \*        \*        \*        \*        \*

DANIEL A. SPAIR,
*Deputy Commissioner.*